Nathan J. Fidel, AZ State Bar No. 025136
Timothy P. Stackhouse, AZ State Bar No. 30609
**MILLER, PITT, FELDMAN & MCANALLY, P.C.**
2800 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
T: (602) 266-5557
F: (602) 266-2223
nfidel@mpfmlaw.com
tstackhouse@mpfmlaw.com
dadetokunbo@mpfmlaw.com (designated for minute entries)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fernando Segoviano Almanza, a single man, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| - vs - | |
| Pinal County, a political subdivision of the State of Arizona; Cooper & Reuter, L.L.P., a domestic limited liability partnership; and Paul and Jane Doe Green, a married couple, | |
| Defendants. | |

## <u>JURISDICTION AND VENUE</u>

1.     This action is brought pursuant to 42 U.S.C. § 1983 and Arizona common law.

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

3.    The acts and omissions giving rise to this action occurred in Pinal County, Arizona.  Venue is proper in this Court's Phoenix Division pursuant to 28 U.S.C. § 1391 and LRCiv 77.1(a).

4.    Plaintiff presented his claims to Pinal County as required by Ariz. Rev. Stat. § 12-821.01 on February 24, 2025, within the time required by law.

5.    Pinal County has not made any disposition of the claims, and the claims are deemed denied because more than sixty days have passed since they were filed. Ariz. Rev. Stat. § 12-821.01(E).

6.    This Complaint is being filed within the time required by law.

## **PARTIES**

7.    Plaintiff Fernando Segoviano Almanza is a single man and a resides in the District of Arizona.

8.    Defendant Pinal County is a political subdivision of the State of Arizona capable of being sued pursuant to Ariz. Rev. Stat. §§ 12-820(7), 821.01.

9.    Defendant Pinal County operates through the Pinal County Attorney's Office ("PCAO"), which is the "public prosecutor of the county," and conducts public prosecutions within Pinal County.  Ariz. Rev. Stat. § 11-532(A).

10.    Defendant Pinal County is liable for PCAO's acts made pursuant to an official policy or custom.

11.    Defendant Pinal County is also liable for PCAO's failure to train and supervise its attorneys and PCAO's deliberate indifference to constitutional rights.

12.    Defendant Pinal County operates through the Pinal County Sheriff's Office ("PCSO"), whose duties are set forth in statute.  Ariz. Rev. Stat. § 11-441.

13.    PCSO's actions along with its knowledge of the investigation and relevant facts is imputed on PCAO and Pinal County.

14.     Defendant Cooper & Reuter, L.L.P., is an Arizona law firm with its principal place of business in Arizona.

15.     At all relevant times, Cooper & Reuter contracted with Pinal County to provide criminal defense services to indigent defendants through the Pinal County Public Defender's Office.

16.     Defendant Paul Green is a resident of Arizona and a licensed attorney who, at all relevant times, was an employee, agent, and/or representative of Defendant Cooper & Reuter, L.L.P., and was acting within the course and scope of his employment when he represented Plaintiff Almanza in 2013.

17.     Defendant Jane Doe Green is named solely to join the marital community of Defendant Paul Green.

18.     At all relevant times, Defendant Green was presumptively acting on behalf of the marital community.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.  Almanza's Personal Background

19.     Almanza was born in Mexico.

20.     He did not attend school as a child.  Instead, he spent his time working, which he began to do at age seven.

21.     When he was ten years old, his mother passed away, leading him to immigrate to the United States later that year.

22.     He and his brother, Antonio Segoviano Almanza, lived for a time in Mammoth, Arizona.  They were homeless and slept in the woods near town.  They cleaned yards to support themselves.

23.     Given Almanza's nonexistent schooling, he cannot read or write in either English or Spanish.  He speaks little English as well.

24. Almanza has severe intellectual limitations in addition to cognitive dysfunction.

25. In 2011, Almanza was living near Winkelman, Arizona. At the time, he owned his own small farm.

26. He also worked part-time as a ranch hand at the Double Check Ranch, also in Dudleyville. Almanza would ride his bike to the ranch.

27. He had various responsibilities around the ranch, like mending fences, fixing the ranch's irrigation system, and feeding and watering the ranch's livestock.

**B. Tensions Between Almanza and Kathryn Quinn (Wilhelmi)**

28. In May of 2011, Kathryn Quinn (now Wilhelmi) moved to the Double Check Ranch with her three children, her eldest, John (nicknamed Jack), her daughter A.W., and the youngest, her son (son).

29. Wilhelmi worked as the ranch's butcher.

30. In September 2011, Almanza was cleaning up the butchering area where Wilhelmi had previously been working. He found a cow fetus, and reported it to the owner of the ranch, Paul Schwennesen.

31. Almanza spoke with Sarah Schwennesen, co-owner of the Double Check Ranch with her husband, Paul Schwennesen, about Wilhelmi's butchering of a pregnant cow. Schwennesen reprimanded Wilhelmi in front of Almanza for killing a pregnant cow.

32. Schwennesen told Almanza to be vigilant to ensure that Wilhelmi did not kill another pregnant cow. If Schwennesen prohibited Wilhelmi from killing the ranch's animals for butchering, then she would lose out on the "kill fee" that she made for doing so.

33. Wilhelmi was irate in response. She told Almanza that she wanted him to quit his job. She told Almanza that if he did not quit, she would make sure he was sent to prison.

## C. Wilhelmi's Pattern of Dishonesty, False Accusations, and Criminality

34.    Wilhelmi's threat to have Almanza sent to prison unless he quit his job was entirely consistent with her well-known reputation at the time for erratic, self-serving behavior, abusing the legal system to get what she wanted, and lying without hesitation. People who knew her also described her as unstable, a habitual drug user, and someone willing to falsely accuse others of crimes when it suited her interests.

35.    Johnny Ink, the father of Wilhelmi's eldest child, Jack, met Wilhelmi in Seattle in 2004. According to Ink, Wilhelmi was an intravenous drug user and "cooking high-quality methamphetamine." Wilhelmi also worked as a prostitute at the time.

36.    Within five weeks of the start of their relationship, Wilhelmi was pregnant with Jack. The day after she gave birth to Jack, she "thrust him at [Ink] and said, 'Fuck you and fuck this baby.'" Wilhelmi abruptly abandoned her first child and Ink and wasn't heard from for more than a year.

37.    Not long after Jack's first birthday, two Seattle police officers visited him in his tattoo studio and explained that Wilhelmi had returned to Seattle and was alleging that he was unfit to care for Jack, and that he had held her at gunpoint and threatened to kill her.

38.    This was a complete fabrication, as Ink did not even own a gun.

39.    After speaking with Ink and observing him with Jack, the officers concluded that Wilhelmi had fabricated the stories. They even warned Jack that he was "in for a nasty custody ordeal."

40.    Ink ultimately lost custody of Jack to Wilhelmi. Wilhelmi took Jack to Arizona and actively concealed their whereabouts to prevent Ink from seeing Jack, which he was entitled to under the custody order.

41.    According to Ink, Wilhelmi is manipulative, a liar, and falsely accused him of threatening her at gunpoint and of abusing and endangering Jack.

42.    Around this time, Wilhelmi was arrested in Tucson and charged with a DUI.  She pleaded guilty to the charge on March 7, 2006.

43.    This was not Wilhelmi's first time facing criminal charges.  She was previously charged in 2001 for shoplifting and providing false information to police.  After she failed to appear for these charges, a misdemeanor warrant for her arrest was issued in 2005.  She was arrested on the warrant shortly thereafter and pleaded guilty to the shoplifting charge.  The charge for providing false information to police was dismissed in exchange for her plea.

44.    According to those who knew Wilhelmi in 2011, she remained a habitual liar, a frequent abuser of the legal system, and a substance abuser.

45.    Paul Schwennesen, who hired Wilhelmi to work at the Double Check Ranch, said that Wilhelmi was a frequent drinker at the time and he suspected that she was using drugs as well.  She would neglect her children, who "would do whatever it took to get her attention."

46.    One night, Wilhelmi called Paul in a frantic state and demanded that he fire Almanza.  She would not explain why he should fire him but was very melodramatic on the phone call.  After Paul had pressed the issue, Wilhelmi said that Almanza had made unwanted advances towards her.  However, he saw Wilhelmi working with Almanza, at her behest, only a couple weeks later and did not believe that Wilhelmi was a victim of harassment by Almanza.

47.    Jaime Kame worked with Almanza and Wilhelmi at the Double Check Ranch.  Kame believed that Wilhelmi "was not as fearful of Almanza as she wanted people to believe" and was dishonest and manipulative.

48.    Sarah Schwennesen knew Wilhelmi to be "prone to histrionics," "drawn to drama" and "very immature."  Additionally, Wilhelmi was an unreliable worker and "often untruthful."

49.    Finally, Wilhelmi also had the ear of law enforcement in Pinal County, as around that time, she was dating a Pinal County Sheriff's Office Deputy James Valdez. Detective Randall Snyder, who led the investigation against Almanza, confirmed in an interview dated December 29, 2012, that Wilhelmi's boyfriend, Deputy Valdez, had access to the reports and radio logs in Almanza's investigation "just like every deputy has."

## D. Wilhelmi's October 22, 2011, Complaint to Police and Lead Up to Almanza's Interrogation

50.    Wilhelmi set into motion the events at issue on October 22, 2011.  At around 5 PM, more than six hours after Almanza had already left the ranch for the day, Wilhelmi called PCSO and reported that Almanza had touched her daughter A.W.'s private parts.

51.    PCSO Deputy C. Pecora contacted Wilhelmi via telephone shortly after her initial report.

52.    During this conversation, Wilhelmi told Deputy Pecora that, at around 11 AM, A.W. told her that Almanza tickled her.  Wilhelmi claimed she did not ask her daughter any further questions at that time.

53.    According to Wilhelmi, at around 4:15 PM, A.W. asked her if she "wanted to know how Fernando tickled her."  Wilhelmi claimed that A.W. said Almanza asked her to play hide-and-seek, and that Almanza "pulled down her panties."  Wilhelmi claimed that A.W. motioned to her vagina.

54.    Deputy Pecora advised Wilhelmi to bring A.W. to a hospital for an evaluation and instructed her to stop at PCSO's San Manuel substation on the way to provide a formal statement.

55.    Wilhelmi drove A.W. to the substation.  Wilhelmi provided a statement in which she added that Almanza had also hit A.W. with a shovel, and that A.W. complained about Almanza's "sharp fingernails."

56.   Wilhelmi also added in this statement that A.W. said it "hurt her to go pee," and that A.W. said that Almanza "did not touch her guts" but later said that Almanza "touched her inside down there."  Wilhelmi stated that she looked at A.W.'s vaginal area, which "appeared abnormally red."

57.   After providing the formal statement, Wilhelmi then drove with A.W. to a hospital more than an hour away in Tucson.

58.   Wilhelmi and A.W. arrived at the pediatric emergency room at Tucson Medical Center at 9:25 PM.  A.W. was evaluated by Dr. Julie Klein.

59.   Dr. Klein noted that when she "first entered the room [she] explained to mom that I would not be asking the patient any questions about what occurred because [A.W.] likely will require a forensic interview.  However shortly after that the patient began offering quite a bit of information."

60.   Without any prompting, A.W. told Dr. Klein that Almanza "asked me if I wanted to go check the pigs with him, when we went to check the pigs he pulled my panties down and he was kissing me, he put his fingers inside me and his fingernails are so sharp that they scratched me."

61.   This new narrative differed from what Wilhelmi initially reported to PCSO—that Almanza had asked A.W. to play hide-and-seek.  Despite this discrepancy, Wilhelmi hold Dr. Klein that A.W. had earlier told her, "the same story."

62.   According to Dr. Klein's note, A.W. also "offered the information that [Almanza] hit her on the back with a shovel."  Dr. Klein did not document any physical injury that matched A.W.'s claim that Almanza hit her with a shovel.

63.   After Dr. Klein concluded her medical evaluation, A.W. and Wilhelmi waited in their room for a Sexual Assault Nurse Examination (SANE).

64.   A nursing note at 12:01 AM on October 23, 2011, stated that while waiting for the SANE nurse, A.W. came "to nursing station, tells group of nurses and MD Klein '[Almanza] he scratched me, and. . . yea. . . he was kissing me.'"

65.    Sharon Welch, RN, began the examination shortly after 1:00 AM on October 23.  She documented a .379 cm abrasion on A.W.'s labia minora.

66.    The medical examiner could not say what caused the scratch.

67.    Additionally, DNA samples taken during the examination did not reveal Almanza's DNA inside A.W.'s vagina or on her body.

68.    A.W. underwent a forensic interview with Kathy Bodwell on October 24, 2011.  During the interview, A.W. again, without prompting, pointed at a drawing of a vagina and "exclaimed 'Fernando touched me there.'"

**E.  Almanza's Arrest and Improper Interrogation**

69.    In the early morning of October 23, 2011, as Almanza was riding his bike to work at the ranch, Pinal County Sheriff's Office deputies arrested him at gun point.

70.    The deputies transported Almanza to PCSO's San Manuel substation and detained him in a holding cell for four hours before finally beginning the interrogation.

71.    Detectives Randall Snyder and J.D. Sanchez, and PCSO Sergeant Luis Vargas interrogated Almanza.

72.    At the outset of the questioning, Detective Snyder told Almanza that they had a search warrant "for some information," like fingernail scrapings, and that Almanza had "to abide by [the warrant]" because "[i]t's a court order."

73.    Detective Sanchez collected the scrapings from Almanza's fingernails and buccal swabs.  He also clipped Almanza's fingernails to test the clippings.

74.    Later testing revealed that none of these samples contained any DNA that linked Almanza to the alleged crime.

75.    The detectives then began the interrogation.  Almanza told the interrogators that he understood only "a little bit English [sic]. Not very good."  Still, they proceeded to interrogate him in English only.

76.    Almanza was completely unaware of why he was being detained and questioned.  He asked if he was being arrested for traffic tickets.

9

77.    He told the interrogators that on October 22, 2011, he was working at the Double Check Ranch.  He came in at his regular time.  He had seen A.W. and Jack that day.  And he returned to his own property in the early afternoon.

78.    Detective Snyder told Almanza that A.W. said that he had touched her. Almanza repeatedly denied the accusation.

79.    Failing to get any sort of a confession from Almanza, Detective Snyder lied to Almanza.  He said that they had found Almanza's DNA "inside [A.W.'s] body," yet Almanza continued to deny that he touched the girl in an inappropriate way.

80.    Almanza, despite expressing significant confusion about what was going on, adamantly denied his guilt.  Almanza was released at the end of the interview, and he left the PCSO substation on his bicycle.

**F.  Almanza's Indictment and Pretrial Representation**

81.    On November 30, 2011, a Pinal County grand jury formally indicted Almanza on one count of Sexual Conduct with a Minor.  Deputy Valdez, who was dating Wilhelmi, arrested him the next day, and he was immediately booked into the Pinal County Detention Center.

82.    Almanza was assigned his first public defender from the Pinal County Public Defender's Office on December 2, 2011.  The Pinal County Public Defender withdrew from Almanza's case on April 30, 2012, due to a conflict.

83.    A contracted defense attorney, Bret Huggins, appeared for Almanza on May 22, 2012.  Huggins also had a conflict of interest and withdrew.

84.    On March 1, 2013, Matthew Lara of Cooper & Reuter entered an appearance as Almanza's attorney.  Defendant Paul Green, however, appeared on Almanza's behalf from April 1, 2013, onwards, despite never filing a formal Notice of Appearance. Green represented Almanza for the remainder of the proceedings.

85.    During this time of ever-changing counsel, Almanza remained in jail.

**G. Wilhelmi's Escalating Erratic Behavior and False Police Reports While Mr. Almanza Awaited Trial**

86.    As Mr. Almanza awaited trial, Wilhelmi's behavior became increasingly erratic and unstable.  During this time, she repeatedly made reports to police that appeared to be the product of paranoid delusions.

87.    On December 27, 2012, Wilhelmi called the Hayden Police Department to report that a person shot at her home because she found a hole in the aluminum siding and "remembered hearing a thump" five days earlier.  The case never went anywhere and was closed shortly thereafter.

88.    On January 18, 2013, Wilhelmi called the Hayden Police Department again to report that someone had poisoned her dogs.  When police responded to her home, they saw the two dogs "were alert and barking."  Wilhelmi claimed that "there were potatoes in the dogs' vomit and that she only feeds her dogs dog food; therefore, it was evidence someone was trying to poison them."  The responding officer closed the case the same day.

89.    On March 6, 2013, Wilhelmi reported "criminal damage" to the Hayden Police.  She stated that she woke up to find,

> that someone had poked holes in paint cans outside of [her] house and poured paint onto the yard.  Apparently a clubless golfclub was used to puncture the paint cans.  A buffalo femur there was used to smash concrete pillars at the front of the residence and squash a squash and a [pumpkin].

Wilhelmi's report was subsequently closed four months later.

90.    Around the Double Check Ranch, Wilhelmi was exhibiting the same erratic, paranoid behavior.  According to Sarah Schwennesen, Wilhelmi "claimed another employee had broken into her residence, read her papers, then put them back into the file out of order, so she would know they had been read."  Additionally, Wilhelmi voiced to Ms. Schwennesen her belief that her phone was tapped.

11

91.    Around the same time, Wilhelmi fell behind on the rent she owed the Schwennesens.  Given the increasing issues, the Schwennesens terminated Wilhelmi's employment and asked her to leave the property.  Instead of leaving, Wilhelmi demanded $10,000 to move out of the ranch's home, which Ms. Schwennesen "viewed as attempted extortion."

## H. Prosecutorial Use of a Jailhouse Informant and Failure to Disclose Cooperation Agreement.

92.    In Spring of 2012, Almanza met another inmate, Johnathan Boggs.  Boggs had a long rap sheet which included two previous felony convictions.

93.    Boggs was in jail at the time after being arrested in February 2012 for several crimes, including aggravated assault, a class 4 felony.  On February 10, 2012, Boggs initially plead guilty to the class 4 felony in exchange for the dismissal of the other charges.  He was set to be sentenced on March 12, 2012.

94.    While Boggs and Almanza were incarcerated together, Boggs helped Almanza draft letters to his family because Almanza was illiterate.  Boggs also read case updates and other information aloud to him.  In doing so, Boggs learned the details about Almanza's case.

95.    About three weeks before he was set to be sentenced, Boggs approached PCAO and claimed that Almanza had confessed to him.

96.    Detective Snyder interviewed Boggs on February 27, 2012.  Boggs told Detective Snyder that two other individuals, Martin Casitas and Ricky Hernandez, were also present when Almanza allegedly made these confessions.

97.    Boggs agreed to testify against Almanza at trial in return for a better plea deal.  PCAO offered Boggs a deal that, in exchange for his testimony, he would plead guilty to a class 6 felony.

98.    If Boggs did not testify, his five dismissed charges would be reinstated; four of those charges were felonies that were more severe than the one charge to which

he had originally pled.  If Boggs did not hold up his end of the deal, the reinstatement would expose him to a potential 15-year prison sentence.

99.    The new plea deal was entered on May 18, 2012.  Boggs would later testify against Almanza at the criminal trial.

100.    PCAO first disclosed Boggs as a trial witness on April 25, 2012.  PCAO then disclosed Boggs' plea deal on May 23, 2012.

101.    Huggins filed a motion for disclosure of information related to Boggs' testimony on June 12, 2012.  The motion specifically requested "disclosure of the wit-ness['s] criminal record and all incentives made or promised for his cooperation."

102.    PCAO disclosed Boggs' criminal history.  However, there was no disclo-sure related to the benefits that PCAO offered him in exchange for his trial testimony because PCAO withheld the earlier, February 2012 plea agreement that had Boggs pleading to a more severe felony charge.

**I.  Almanza's Unfair Trial and Wrongful Conviction.**

103.    Almanza's criminal trial commenced on September 30, 2013.  Two prose-cutors tried Almanza's case in 2013: Matthew Long and Thomas Kohler.

104.    In his opening and closing statements, Long engaged in a pattern of in-flammatory and improper statements to appeal to the jury's emotions rather than the evidence.

105.    Long repeatedly referred to Almanza, who is dark skinned, as a "poacher," a "hunter," a "fox," and a "fox in the henhouse."  He described A.W., who is white skinned, as "prey" who had been "selected" and "snatched up," and referenced "hunting grounds" and "traps" that Almanza allegedly laid.

106.    These metaphors served to dehumanize Almanza while evoking fear and revulsion.  They were even more improper given the racial undertones and the fact that Almanza is Latino.

107.   Despite their prejudicial nature of these racially charged descriptions, Green did not object at any point, allowing Long to frame Almanza as a predator.

108.   On October 1, 2013, the first day of testimony, the prosecution called A.W. to testify, followed by Wilhelmi.  Kathy Bodwell, the nurse who conducted the forensic interview of A.W., was also called that day.

109.   Green failed to challenge A.W.'s credibility or test the reliability of her testimony.  Instead, Green began the cross-examination by apologizing and stating, "I'm sorry that I'm making you talk about it, but it's really important."  He concluded by telling A.W., "I'm sorry we had to ask you all these questions. You've been a really good witness, though. You've done a good job."

110.   Despite initially stating that Almanza hit her on the back with a shovel, A.W. did not repeat this claim during her trial testimony.  Likewise, there was no evidence introduced about any injuries that Almanza allegedly caused with a shovel.

111.   Despite this inconsistency and the absence of injury, Green did not question A.W. about the alleged shovel incident during cross-examination.

112.   Instead, Green's cross-examination reinforced A.W.'s version of events and gave the jury the impression that defense counsel accepted her testimony as truthful.

113.   Green's cross-examination of Wilhelmi also failed to meaningfully challenge her credibility, despite having multiple avenues to do so.

114.   At no point did Green question her about her romantic relationship with a Deputy of the PCSO, which existed during the investigation and prosecution of Almanza.

115.   Nor did Green cross-examine Wilhelmi on her previous criminal conduct, which included being arrested and charged with the crime of making false statements to the police and being convicted of shoplifting.

116.   Notably, the PCAO failed to disclose to the defense that Wilhelmi had engaged in material acts of dishonesty, including providing false statements to police.  The

14

prosecution's failure to disclose the impeachment evidence, by itself, constituted a violation of Almanza's constitutional rights.

117.    Green also failed to confront Wilhelmi with her prior history of making outlandish reports to the Hayden Police Department.

118.    Because Green never interviewed Johnny Ink, he also had no basis to cross-examine Wilhelmi on the false reports of domestic violence and child abuse she made against Ink back in 2005.

119.    Green also questioned Wilhelmi about allegedly punching Almanza previously.  This opened the door for Wilhelmi to testify that Almanza "behaved inappropriately with" her.

120.    Green not only opened the door for Wilhelmi to testify that Almanza made unwanted advances but failed to introduce evidence that three people, Jaime Kame and Paul and Sarah Schwennesen, did not believe her, and that her behavior towards Almanza afterward was completely inconsistent with her claim that he had harassed her.

121.    On direct examination, Bodwell testified that a sign that a child was coached to make a false accusation was the unprompted volunteering of information, "that right in the beginning of the interview, the child is already telling me things, like disclosing things."  In other words, "if children are coached, they'll come in and just blurt it out."

122.    On October 2, 2013, the prosecution called Boggs.

123.    On direct examination, Boggs told the jury that he had received no benefit in exchange for his testimony and that the prosecution could not reinstate previously dismissed charges against him.  He claimed he was protected from further prosecution under the doctrine of double jeopardy.

124.    In truth, Boggs had entered into a plea agreement expressly conditioned on testifying at Almanza's trial.  Despite the existence and contents of the plea agreement, Green never cross-examined Boggs on it.  Green never informed the jury that Boggs

had a strong incentive to testify or that he had misrepresented the nature of his deal with the State while under oath.

125.    The prosecutor who handled Boggs' direct examination, Thomas Kohler, falsely bolstered Boggs' testimony by claiming that the plea deal was offered to him before Boggs reached out to Detective Snyder about Almanza.  In reality, Boggs was offered, and accepted the plea agreement, months after his interview.

126.    To compound the prejudice against Almanza, Long knowingly relied on Boggs' false testimony that he received no benefit for testifying.  Long knew that the agreement contained a clear provision requiring Boggs' testimony in exchange for a reduced charge and the dismissal of more serious charges.

127.    Nonetheless, Long allowed Boggs to falsely claim that double jeopardy protected him from re-prosecution and that he had "nothing to gain" by testifying.

128.    Long then built his closing argument around Boggs' testimony, vouching for his credibility and affirming to the jury that Boggs "had absolutely nothing to gain by speaking his truth."

129.    Green failed to object to this improper vouching and reliance on demonstrably false testimony.

130.    The jury retired to deliberate at 3:09 p.m.  At 4:01 p.m., the foreperson announced that they had reached a verdict.

131.    On October 7, 2013, just over two years since Wilhelmi told him that she'd see to it that he would go to prison, a jury found Almanza guilty of sexual conduct with a minor.

132.    On January 10, 2014, Almanza was sentenced to life imprisonment, with no chance of parole until he had served at least thirty-five years of the sentence.

**J.  Wilhelmi's Post-Trial Escalating Erratic, Manipulative, and Dishonest Behavior**

133.    Following Almanza's conviction and sentencing, Wilhelmi's erratic and attention-seeking behavior intensified.    Several bizarre and unstable actions further demonstrated her willingness to manipulate events, people, and the justice system.

134.    On October 21, 2013, just two weeks after Almanza was found guilty, Wilhelmi filed a lawsuit against Paul and Sarah Schwennesen and their ranch, Double Check Ranch Enterprises, LLC, alleging claims of negligence and vicarious liability.

135.    Wilhelmi's swift actions suggested a plan she had formed since even before Almanza's trial.  Jaime Kame overheard her tell her children that they "would own the Double Check Ranch someday because she intended to sue" the Schwennesens.

136.    After Almanza's trial, Wilhelmi's drug use also increased.  According to one ranch employee who knew her during this time, Wilhelmi "had turned into a tweaker."  Another ranch employee stated her appearance showed signs of heavy drug use, and that he and his wife "encouraged [Wilhelmi] to get into rehab, to no avail."

137.    On April 4, 2016, Wilhelmi called the Hayden Police to report her then-husband, Vincent Gonzales, "attempted to kill her" and "grabbed her from behind with his hand over her face and threw her [to] the ground and placed his knee into her back causing an[] injury to her back and neck."

138.    The responding officer interviewed two of Wilhelmi's neighbors.  They stated that "while [Wilhelmi] was outside she was rolling around on the ground and removing clothing to stage an assault to possibly get Vince arrested."  The responding officer did not find any injuries that corroborated Wilhelmi's story.

139.    Wilhelmi's staged "assault" was in retaliation to Gonzales, who that evening had discovered another man's clothing in their home and confronted her about having an affair.  When Wilhelmi began to yell and "freak out and [fall] to the floor," Gonzales left the residence and waited outside.

140.    Wilhelmi continued to lie in an attempt to have Gonzales arrested.  On April 6, 2016, she reported that he choked her.  However, a forensic examiner who

evaluated Wilhelmi's injuries that same day told police that Wilhelmi had told her a different story than what she had told police, and that her "injury complaints are not consistent with the injuries on [her] person."

141.    On April 29, 2016, Gila County Attorney's Office declined to prosecute Gonzales for aggravated assault–strangulation, concluding that "it appears the injuries to the victim were self-inflicted."

142.    Around the time of Wilhelmi's false report, Jason Quinn, the father of her youngest son, Jack, petitioned for full custody, citing her severe drug abuse and physical abuse of the children.  The petition was granted, and the court ordered Wilhelmi to undergo hair follicle testing.  A test dated June 16, 2016, returned positive for methamphetamine.

143.    In October 2016, Wilhelmi was charged with aggravated assault for pointing a handgun at her then-boyfriend, as well as resisting arrest.  She ultimately pled guilty and, on June 3, 2017, was convicted of felonious disorderly conduct with a weapon and sentenced to three years of probation.

144.    Beginning in November 2016, Wilhelmi was also under a family court order to submit to weekly random drug testing.  Despite this order, she repeatedly refused to take the required tests.

145.    Wilhelmi remained on probation until December 2017, when it was revoked for multiple violations.  One violation involved an attempt to evade a court-ordered drug urinalysis: she was caught with a bottle of clean urine hidden in the sleeve of her jacket.  When confronted, Wilhelmi first told her probation officer that she had a wrist injury and the bottle was a "heat bottle," then offered to drink the "water" in the bottle to prove her point.

146.    Her probation revocation order cited other violations, most notably new charges filed by the Superior Police Department of False Reporting, Possession of Drugs and Possession of Drug Paraphernalia.

## K. Post-Conviction Proceedings

147.   After the Arizona Court of Appeals affirmed Mr. Almanza's conviction and sentence on August 29, 2014, his appellate counsel did not file a Notice of Post-Conviction Relief.  Because Mr. Almanza is illiterate in both Spanish and English, he was unaware of the appellate court's mandate until another inmate read the attorney's letter to him.  He filed a pro per Notice of Post-Conviction Relief on March 19, 2015.

148.   Initially, Almanza had a court-appointed post-conviction counsel, who withdrew from Almanza's case in February 2016.

149.   The trial court gave Mr. Almanza until May 31, 2016, to file a pro per petition, which he submitted on May 19, 2016.  The petition raised claims of ineffective assistance of counsel and violations of the right against self-incrimination.  The trial court denied the petition on August 5, 2016.

150.   Mr. Almanza sought review by the Arizona Court of Appeals on February 21, 2017.  The appellate court dismissed the petition on July 25, 2017, solely because Mr. Almanza had not timely filed his notice of post-conviction relief.  His motion for reconsideration was denied on August 11, 2017.  The Arizona Supreme Court denied review on August 25, 2017.

151.   While these proceedings were ongoing, Almanza also sought habeas relief in federal court.  His initial petition for writ of habeas corpus was filed on October 15, 2015.

152.   United States District Judge Douglas Rayes presided over Almanza's petition.  On June 1, 2016, Judge Rayes ordered the Federal Public Defender for the District of Arizona to represent Almanza in the petition.

153.   With the assistance of counsel, Almanza filed an Amended Petition for Writ of Habeas Corpus on July 6, 2018.

154.   As a part of his petition, Almanza's counsel obtained declarations from six of the jurors from the 2013 trial.

155.    These jurors report that they found Boggs' testimony about Almanza's alleged confession to be some of the most persuasive evidence presented at trial and are deeply disturbed to learn that Boggs' claim of receiving no benefit for his testimony was not truthful.

156.     The jurors also note that Green did not appear to defend Almanza vigorously, and that he offered very little evidence and made minimal statements on Almanza's behalf, leaving the jury with few reasons to question the prosecution's case.

157.    On March 15, 2023, Judge Rayes granted Almanza's Amended Petition and ordered his release from custody within 90 days, unless the state retried and convicted him.

158.    On April 7, 2023, the Arizona Attorney General's Office confirmed that it would not appeal Judge Rayes' order.

159.    Despite Judge Rayes' order, Almanza was still incarcerated when the 90-day period expired on June 14, 2023.  Almanza's counsel filed a motion enforce the order on June 16, 2023.

160.    On July 17, 2023, Judge Rayes granted Almanza's motion and ordered his immediate release from custody.

**L. The August 2024 Retrial and Acquittal**

161.    Pinal County did retry Almanza.  This time, William Wallace was the PCAO prosecutor on the case.  Anthony Kenney represented Almanza.

162.    During Almanza's second trial, the defense was finally able to present critical evidence and cross-examine witnesses more effectively than during the first trial.

163.    Unlike the first trial, the defense highlighted the inconsistencies in the testimony of key witnesses, including Wilhelmi and A.W.  Kenney's questioning outlined Wilhelmi's motive and opportunity (the long amounts of time that she was alone with A.W.) to coach A.W, her rampant substance abuse, and her relationship with Deputy Valdez.

164. The jury in the second trial also heard evidence that undermined Boggs' jailhouse informant testimony, including information about the benefits Boggs received in exchange for testifying.

165. On August 30, 2024, after a four-day trial, a jury acquitted Almanza of the lone charge against him.

166. The Arizona Attorney General's Office did not seek review or otherwise appeal the jury's verdict.

167. After almost thirteen years, Fernando Almanza could begin to rebuild his life.

## COUNT I
### (*Monell* / 42 U.S.C. § 1983)
### Defendant Pinal County
**(Unconstitutional policies, customs, and practices, failure to supervise and discipline, act of final policy maker, amounting to deliberate indifference to constitutional rights to due process and a fair trial.)**

168. Plaintiff incorporates all the above factual allegations as though set forth herein.

169. Under *Monell v. N.Y.C. Dep't of Soc. Servc.*, 436 U.S. 658, 690-91 (1978), Defendant Pinal County is liable for action or inaction that "unconstitutionally implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the action is made "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels."

170. Under *Monell*, a local government body is liable under § 1983 for policies of inaction as well as policies of action. *Gibson v. Cnty. Of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002). A policy of inaction is based on a government body's "failure

to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012).

171.   Prior to and at all times relevant to Almanza's arrest and prosecution, Defendant Pinal County, through PCAO, maintained affirmative or *de facto* unconstitutional or improper policies, customs, and practices that evinced deliberate indifference to the constitutional rights to due process and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution.

172.   For example, in July 2014, a Pinal County Superior Court judge declared a mistrial "due to the actions of county prosecutors, [marking] the third time in a month that ethics concerns were raised about the handling of death-penalty murder cases by the Pinal County Attorneys' Office."[1]

173.   That mistrial resulted after PCAO prosecutor Long asked Judge Boyd Johnson to excuse himself to deal with an "administrative matter" but then "secretly interview[ed], without an attorney present, a defense witness who was facing charges in another case." Judge Johnson determined that Long's actions amounted to improper influence of the witness, leading the witness to feel "the need to cooperate with the state, perhaps, and feeling that he has to tailor his testimony."

174.   The mistrial came just days after the State Bar of Arizona opened an inquiry into PCAO's deliberate violations of a court order in another case related to sealed documents.

175.   These incidents indicate a custom/practice of unabated prosecutorial misconduct that was also apparent in Almanza's case, including: (1) knowingly and deliberately violating *Brady* by failing to disclose the benefits that PCAO offered John Boggs in exchange for his trial testimony, (2) knowingly and deliberately violating *Brady* by failing to disclose their key witness Wilhelmi's prior acts of dishonesty, (3) knowingly and deliberately violating *Brady* by failing to disclose their key witness Wilhelmi's

---

[1] Sean Holstege, *Ethics Concerns in Pinal Death-Penalty Cases*, AZCENTRAL (Aug. 4, 2014).

22

romantic relationship with a PCSO Deputy, and (4) knowingly and deliberately violating *Giglio* by permitting Boggs to testify falsely and vouching for Boggs' credibility based on that false testimony.

176. Long acted as a final policy maker for PCAO when committing the above acts and other wrongful conduct relating to Almanza's case.

177. In Almanza's case, the suppressed evidence was material, likely to influence the jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of Almanza's trial would have been different.

178. Concerns about Long's pattern of dishonesty were known within the PCAO. Senior attorneys raised concerns regarding Long's false statements in multiple cases, including Almanza's, and internal discussions acknowledged prior misconduct, possible bar complaints, and resume inflation during his hiring.

179. PCAO never acted to terminate Long on any warning signs about his misconduct in criminal trials. He eventually resigned from PCAO on January 9, 2015.

180. PCAO continued its unconstitutional policies, customs, and practices when it elected to prosecute Almanza a second time in 2024, despite no reasonable probability of securing a conviction. By that time, the evidence against Almanza had weakened, additional witnesses had been identified who would testify in his favor, and Wilhelmi's credibility had been further undermined by multiple arrests and Department of Child Safety proceedings reflecting her dishonesty and instability. PCAO's decision to retry Almanza under these circumstances was a continuation of its deliberate indifference to constitutional rights.

181. PCAO's policies, customs, and practices evinced deliberate indifference to criminal defendants' constitutional rights resulted in the deprivation of Plaintiff's constitutional rights.

182. As a direct result of the above-described conduct, Plaintiff experienced a profound deprivation of his civil rights and liberties, resulting in his wrongful

conviction and wrongful incarceration totaling more than thirteen years of his life, and a loss of property.

183.    Pinal County, through Pinal County Attorney Kent Volkmer and Deputy County Attorney William S. Wallace, continued to engage in these customs and practices as recently as 2024, when Deputy County Attorney Wallace forced Almanza to stand trial a second time for a crime he did not commit.  Although he was ultimately acquitted, the stress, fear, and humiliation of being prosecuted inflicted additional damages on him beyond the thirteen years he had already wrongfully spent incarcerated.

184.    The violations of Plaintiff's constitutional rights could have been prevented had appropriate customs and policies been in place at PCAO.

### COUNT II
**(Negligence/Attorney Malpractice Claim)**
**Defendants Cooper & Reuter, L.L.P. and Paul Green**

185.    Plaintiff incorporates all the above factual allegations as though set forth herein.

186.    Paul Green began representing Almanza around April 1, 2013.

187.    At all relevant times, Green was an employee, agent, and/or representative of Defendant Cooper & Reuter, L.L.P., and was acting within the course and scope of his employment.  Accordingly, Defendant Cooper & Reuter, L.L.P. is liable for Green's negligent acts and omissions under the doctrine of *respondeat superior*.

188.    Green's representation of Almanza fell below the standard of care expected of a reasonably competent attorney practicing in similar circumstances in several ways:

//

24

### i. Failure to Seek Suppression of Evidence Arising from Almanza's Unconstitutional Arrest and Interrogation.

189.    Prior to his withdrawal as Almanza's counsel, Huggins filed two motions to suppress evidence arising from his October 23, 2011, interrogation.  Huggins argued that, given Almanza's language barrier, his confusion about the circumstances, and his repeated statements expressing uncertainty about whether he needed an attorney and reluctance to answer questions, all of his statements were involuntary, and the statements and any evidence derived from them should be suppressed.

190.    Green failed to file replies in support of those suppression motions.  At a pretrial conference on September 30, 2013, the trial court held an impromptu and cursory voluntariness hearing.  Green was clearly unprepared for the hearing and caught off-guard when the trial court raised the issue.

191.    During the hearing, Green failed to correct several factual inaccuracies that the trial court relied upon to deny the motion, including the mistaken claim that Detectives Snyder and Sanchez informed Almanza that he was not under arrest and was free to leave.

192.    Green did not call any witnesses who could have laid the foundation that Almanza was "in custody" during the interrogation.  For example, the PCSO deputies who did place Almanza under arrest prior to bringing him down to the San Manuel substation, or Almanza himself, who could have testified to his four-hour-long detainment in a holding cell, and whether he was handcuffed during the interrogation.

### ii. Failure to Develop Evidence About Almanza's Cognitive Impairment.

193.    First, despite being aware of Almanza's cognitive impairments, Green failed to retain any experts to evaluate his intellectual functioning or developmental limitations until after he was convicted.  This failure was particularly significant given that the prosecution's case relied heavily on alleged confessions made by Almanza to both law enforcement and a jailhouse informant.

194.   Post-conviction evaluations by experts retained by the Office of the Federal Public Defender revealed that Almanza's cognitive functioning has been impaired since early childhood, with abilities comparable to those of an eleven-year-old.  Additional neuropsychological testing further identified language deficits, low intellectual functioning, and borderline cognitive processing speed, largely attributable to Almanza's poor early development and minimal formal education.

195.   Likewise, Green did not seek to retain a false confession expert, despite these cognitive limitations, language barrier, and the coercive nature of the interrogation.  Such expert testimony would have helped demonstrate that Almanza's statements were not reliable admissions.

196.   Had Green investigated and presented this evidence, he would have directly undermined the reliability of the alleged confessions and Almanza's capacity to understand or knowingly waive his rights.

197.   Green's failure to do so prejudiced Almanza's defense and contributed to his wrongful conviction.

### iii. Failure to Develop and Call Credibility Witnesses at Trial.

198.   Green failed to investigate or call key witnesses who could have provided credible testimony in support of Almanza and undermined the credibility of Wilhelmi and A.W.

199.   One such witness, Jaime Kame, an employee at Double Check Ranch, informed the defense investigator that he was not present on the date of the alleged incident.  However, the investigator failed to follow up with any additional questions.  Had Kame been interviewed further, he would have testified that Wilhelmi had a reputation for dishonesty and manipulation, had expressed a desire to sue the ranch and "own it someday," and had a history of lying to law enforcement.   Kame also knew Wilhelmi was romantically involved with a Pinal County sheriff's deputy during the investigation and that Almanza refused his suggestion to flee to Mexico, affirming his innocence.

200.    Green did not call Paul Schwennesen, owner of the Double Check Ranch, to testify despite being a credible witness.   Schwennesen would have testified that he believed the accusations were fabricated, that Wilhelmi likely abused drugs, and that she had a history of abusing the legal system to her benefit.  He also had serious doubts about the veracity of A.W.'s and Quinn's testimony and viewed the entire case as a setup.

201.    Green never even contacted Schwennesen's wife, Sarah Schwennesen. She would have testified that she was skeptical of the allegations from the start, describing Wilhelmi as "prone to histrionics" and untruthful.  Schwennesen personally observed inconsistencies in Wilhelmi's behavior towards Almanza.  Schwennesen would also have testified to Wilhelmi's attempt to extort money from her and Paul after they fired her from the ranch.

202.    Finally, Green overlooked another critical witness, Johnny Ink, the father of Wilhelmi's oldest son.  Ink would have testified that Wilhelmi had a history of drug abuse, worked as a call girl, and abandoned her child after birth.  He also had firsthand experience with her making false and defamatory allegations during a custody dispute. Ink believed that Wilhelmi's accusations were not credible based on her past manipulative conduct and history of lying to law enforcement and the courts.

### iv.  *Failure to Develop Medical and Psychological Expert Evidence.*

203.    In addition to Green's failure to introduce evidence related to Almanza's intellectual disabilities and to call relevant credibility witnesses, he also failed to develop medical and psychological evidence as well.

204.    Green did not consult with or present a medical expert to challenge the prosecution's evidence regarding A.W.'s injuries.  An expert could have testified that the injuries were inconsistent with both the prosecution's theory and the defense's barbed wire explanation and could have refuted unreliable testimony from the prosecution's medical witnesses.

205.   Green also failed to introduce medical records showing Almanza had recently undergone hernia surgery and was under restrictions that made the alleged physical conduct implausible.

### v.   *Failure to Object to Numerous Instances of Prosecutorial Misconduct at Trial.*

206.   Perhaps most harmful to Alamanza's case, Green failed to object to repeated instances of prosecutorial misconduct during the trial.

207.   Long engaged in a pattern of improper and unconstitutional behavior at Almanza's trial, including: (1) knowingly and deliberately violating *Brady* by failing to disclose the benefits that PCAO offered John Boggs in exchange for his trial testimony and (2) knowingly and deliberately violating *Giglio* by permitting Boggs to testify falsely, vouching for Boggs' credibility based on that false testimony.

208.   Green's failure to object to any of these violations allowed the misconduct to go unchecked, distorted the jury's understanding of the case, and prejudiced the outcome.

\*\*\*

209.   Green's acts and omissions, including his failure to investigate, prepare a defense, impeach key witnesses, consult necessary experts, and object to prosecutorial misconduct, fell below the standard of care expected of a reasonably competent attorney practicing in similar circumstances.  His performance did not reflect the skill, diligence, or preparation required to provide effective representation in a serious felony trial.

210.   Green's failures as Almanza's counsel largely served as the basis for Judge Rayes' Order granting Almanza's Amended Petition for Writ of Habeas Corpus.  Judge Rayes found that "there is a reasonable probability that, but for [Green's] deficient performance, the result of the proceeding would have been different."

211.   Green's negligence prejudiced Almanza's defense and contributed to his wrongful conviction.

212.    As a direct and proximate result of Green's negligent acts and omissions, Plaintiff suffered severe harm, including wrongful conviction, loss of liberty, emotional distress, reputational damage, loss of property, and other economic and non-economic losses.

### RELIEF REQUEST

Plaintiff requests judgment against Defendants in an amount that will reasonably compensate Plaintiff, plus costs incurred in this action, attorneys' fees pursuant to 42 U.S.C. § 1988, and for such further relief as the Court deems proper.

### JURY DEMAND

Plaintiff requests a jury trial on all claims so triable.

Respectfully submitted this 27th day of August, 2025.

MILLER, PITT, FELDMAN & McANALLY, P.C.

By:   */s/* Nathan J. Fidel
        Nathan J. Fidel
        Timothy P. Stackhouse
        *Attorneys for Plaintiff Almanza*